UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JOSEPH PERRI,<br><br>       **Plaintiff,**<br>v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION and EXPRESS SCRIPTS, INC.,<br><br>       **Defendants.** | Civ. No. 15-6547<br><br>**OPINION and ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

      This *qui tam* matter, brought by relator Joseph Perri ("Relator") on behalf of the United States, originally alleged that defendants Novartis Pharmaceuticals Corporation ("Novartis") and Express Scripts, Inc. ("ESI") engaged in a scheme in relation to Gilenya, a prescription drug, a scheme said to violate the Anti-Kickback Statute ("AKS"). The original complaint asserted four counts under the False Claims Act ("FCA"), the fourth of which was a claim that Perri was terminated in retaliation for objecting to the kickback scheme, in violation of 31 U.S.C. § 3730(h). In a substantial opinion ("Op.", DE 38), I granted the defendant's motion to dismiss the original complaint, granting leave to amend.

      Now the plaintiff has filed a First Amended Complaint. ("1AC", DE 46) The 1AC nevertheless retains most of the factual allegations of the original, while adding a few more in response to deficiencies noted in the Court's prior opinion. The 1AC does not, however, amend or attempt to reinstate the three main FCA claims. It reasserts only the claim of retaliatory dismissal, in an amended version.

      Now before the Court is the motion of the defendant, Novartis, to dismiss the 1AC for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (DE 48)

For the reasons stated herein, the motion is denied. Familiarity with the case is assumed; this opinion should be read in conjunction with my prior Opinion.

**I.     Standard**

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).[1]

---

[1]     In my prior opinion, I applied the heightened pleading standard of Fed. R. Civ. P. 9(b) to the allegations of fraud in the submission of false claims. Those dismissed counts, however, are not reasserted in the 1AC. I apply the

## II.     Discussion

The single count of the 1AC alleges that Relator was terminated from employment in retaliation for his having objected to an illegal kickback scheme, in violation of 31 U.S.C. § 3730(h). That kickback was the foundation of the now-dismissed False Claims Act counts. (A claim is said to be "legally false" if accompanied by a false certification that the claimant is in compliance with federal law—here, the AKC.) Relator asserts, correctly, that a retaliation claim does not require that the underlying conduct have turned out to be illegal under the FCA. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001) (holding that the FCA's anti-retaliation provisions "do[ ] not require the plaintiff to have developed a winning qui tam action"; they "only require [ ] that the plaintiff engage in acts [made] in furtherance of an [FCA] action.") (citations, internal quotations, and alterations omitted). The FCA claims from the original complaint, then, although deceased, continue to haunt the case; they form the basis of Relator's alleged whistleblowing, which allegedly led to his dismissal.

### A. Dismissal of Former Counts I, II, and III

I refer only briefly to Relator's allegations of FCA violations based on the kickback scheme; they are summarized more thoroughly in my prior opinion. They arise from the relationship between Novartis, the manufacturer of Gilenya, and ESI, a Pharmacy Benefit Manager ("PBM") that sponsors commercial, Medicare Part D ("Part D"), and Medicaid health plans. PBMs like ESI administer prescription drug benefits and develop formularies, a list of prescription drugs that are covered under a member's prescription drug health plan. PBMs generally negotiate with drug manufacturers, who offer discounts and rebates to secure placement of their medications on the formulary. Relator's original theory of liability was that Novartis provided substantial

---

ordinary Rule 8 standard to the remaining retaliation claim, which does not sound in fraud.

commercial discounts and rebates on Gilenya for ESI's commercial health plans in return for ESI's Medicare Part D business.

Effective January 1, 2013, Novartis and ESI agreed to a 6.375% discount on Gilenya for ESI's Part D plans. For commercial plans, however, there was no discount on Gilenya as of January 1, 2013. In October 2013, Relator alleges, ESI threatened to remove Gilenya from both its Part D and commercial formularies after a competitor placed a cheaper, safer, and comparably efficacious drug on the market. In response, Novartis allegedly provided a discount on Gilenya for ESI's commercial plans (but not its Part D plans) in exchange for the "continued" placement of Gilenya on the formularies. This arrangement, according to Relator, amounted to a kickback to the commercial plans at the expense of the Part D plan.

I dismissed the allegations of false claims under the FCA. The "threat" by ESI was not alleged in a factual manner. Nor were any facts pled to substantiate the allegation that the Novartis instituted the commercial discount to induce ESI to retain Gilenya in its formularies. Relator Perri, I pointed out, was an insider in relation to these transactions, and would know the facts. The company's failure to isolate the commercial negotiations from the Part D negotiations, I held, did not violate any regulation; while perhaps providing a potential opportunity for fraud, the merger of those functions did not itself constitute fraud. I further found that the allegations suggested equally plausible, legitimate justifications for the commercial discount. (Op. 28–32) Thus the factual allegations, I held, failed to satisfy the heightened fraud-pleading standard of Fed. R. Civ. P. 9(b)

### B. Dismissal of Retaliation Claim

I also dismissed the FCA retaliation claim — *i.e.,* former Count IV, the predecessor of the claim now asserted in the 1AC — for failure to meet the ordinary Rule 8 pleading standards of *Twombly* and *Iqbal, supra.* In doing so, I summarized the anti-retaliation law thus:

4

In Count IV, Relator alleges that his employment at Novartis was terminated because he sought to bring "parity" between the commercial and Part D discounts, and he expressed his concerns about this "disparity" to his "supervisors." . . .

Section 3730(h) provides a cause of action for employees who assist the government in the investigation and prosecution of FCA claims. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 185–86 (3d Cir. 2001).[2] The FCA's anti-retaliation provision provides as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). To establish a claim for retaliation under 3730(h), a relator must show that "(1) he engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730)"; and "(2) that he was discriminated against because of his protected conduct." *U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110–11 (3d Cir. 2007) (internal citations omitted); *see DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018). To demonstrate discrimination "because of" his or her activities in furtherance of an FCA suit, a plaintiff must demonstrate that "(1) his employer had knowledge he was engaged in protected conduct; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in protected conduct." *Hefner*, 495 F.3d at 111 (internal citation and quotation marks omitted).

---

[2]   A retaliation claim does not require proof of a viable underlying FCA claim. As the Court in *Hutchins* explained, the retaliation provisions "do[ ] not require the plaintiff to have developed a winning qui tam action"; they "only require [ ] that the plaintiff engage in acts [made] in furtherance of an [FCA] action." *Hutchins*, 253 F.3d at 187 (citations, internal quotations, and alterations omitted); *see also Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 n.1, 125 S. Ct. 2444, 162 L. Ed. 2d 390 (2005) ("[P]roving a violation of [the FCA] is not an element of a § 3730(h) cause of action."). [fn. in original]

5

As to "what activities constitute protected conduct, the case law indicates that protected [conduct] requires a nexus with the in furtherance of prong of [a False Claims Act] action," which "involves determining whether [plaintiff's] actions sufficiently furthered an action filed or to be filed under the [False Claims Act]." *Hutchins*, 253 F.3d at 187 (alterations in original; internal citation and quotation marks omitted). "Protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" an FCA suit. *Id.*; 31 U.S.C. § 3730(h). It also encompasses internal reports of FCA violations. *Hutchins*, 253 F.3d at 187. Protected activity does not, however, include "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Id.* at 187-88.

There is also a required causation nexus. The FCA "requires employees to prove they were discriminated against 'because of' their 'protected conduct.'" *Hutchins*, 253 F.3d at 188; *see also DiFiore*, 879 F.3d at 78 (holding that FCA requires "proof of 'but-for' causation."). In order to meet this "because of" element, "a plaintiff must show his employer had knowledge that he was engaged in 'protected conduct' and that the employer retaliated against him because of that conduct." *Hutchins*, 253 F.3d at 188. This element cannot be satisfied unless, at a minimum, the employee "put his employer on notice of the 'distinct possibility' of [FCA] litigation." *Id.*

Such notice of a "distinct possibility" of FCA litigation "is essential because without knowledge an employee is contemplating a False Claims Act suit, 'there would be no basis to conclude that the employer harbored § 3730(h)'s prohibited motivation, i.e., retaliation.'" *Id.* (citing *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999)). An employer may be on notice of a "distinct possibility" of litigation "when an employee takes actions revealing the intent to report or assist the government in the investigation of a [FCA] violation." *Id.* at 189; *see also id.* at 188 n.8 (noting that while "the 'protected conduct' and notice requirements are separate elements of a *prima facie* case of retaliation under § 3730 . . . the inquiry into these elements involves a similar analytical and factual investigation.").

The Court in *Hutchins* recognized several considerations in evaluating whether the employer was on notice: whether the plaintiff's complaints led to internal or external investigations;

> whether the plaintiff used the words, "illegal," "unlawful," "qui tam," "fraud" or "fraudulent" in characterizing his concerns regarding the charges; whether the plaintiff's "regular job duties" involved "investigating and reporting fraud" or, similarly, whether the plaintiff uncovered the alleged fraud through his performance of specifically "assigned task[s]"; and whether the plaintiff can rebut evidence that his supervisors had no knowledge of the protected activity. *Id.* at 189-92 (citations omitted).

(Op. at 33–35)

Discussing the allegations of the original complaint in relation to those standards, I found them insufficient:

> Regarding the notice element, Relator alleges that at some unspecified time and place, he "voiced his concerns about the rebate structure to his ESI counterpart, Todd Jeffery." (Compl. ¶110). This is the only allegation of whistleblowing that even approaches concreteness. Elsewhere, Relator alleges that he expressed his concerns about the "disparity" between the rebates to his "supervisors." (Compl. ¶¶136, 14). Jeffery, however, was not Relator's "supervisor"; he worked for ESI. What Relator appears to mean is that he "believes" that this conversation with Jeffery somehow "made its way to Novartis's management in the second week of June," and was therefore equivalent to a statement to Novartis. (Compl. ¶112). Relator's allegation that he complained to ESI is plainly insufficient to put Relator's employer, Novartis, on notice of some impropriety. And his factually unsupported, speculative "belief" that word somehow got back to Novartis does not bridge the gap. *See also United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 266 (S.D.N.Y. 2014) (noting that FCA allegations made on "information and belief are inherently speculative"); *see also Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313 (D.N.J. 2005).[3]

> Just as important is the complaint's failure to state that Relator's alleged statement to his supervisors at Novartis related to a violation of the AKS or FCA. Indeed, it is not even clear whether

---

[3] I observe in passing that a statement that happened to get back to the employer strains the very meaning of an "internal report" of wrongdoing. [fn. in original]

7

Relator is saying that he complained to ESI about ESI's conduct or about Novartis's conduct.

Internal reporting, to be sure, can qualify as a protected activity under the FCA, provided that the protected activity concerns fraud on the government to obtain Medicare payments. *See Campion v. Ne. Utilities*, 598 F. Supp. 2d 638, 658 (M.D. Pa. 2009) (dismissing retaliation complaint where plaintiff reported his "concern about mischarging the government to his supervisor," but allegation "does not suffice to establish that he was acting 'in furtherance of' a qui tam action" and was "unconnected to exposing fraud or false claims against the federal government."); *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government."); *see also U.S., ex rel. LaPorte v. Premier Educ. Grp., L.P.*, No. Civ. 11-3523 RBK/AMD, 2014 WL 5449745, at *13 (D.N.J. Oct. 27, 2014) (dismissing retaliation claim where complaint failed to allege that relators "were investigating, initiating, testifying for, or assisting with a FCA action when they alerted [employer] to the alleged wrongdoing," and failed to connect alleged wrongdoing to FCA when complaining to employer); *Guerrero v. Total Renal Care, Inc.*, 2012 WL 2237689, at *5 (W.D. Tex. Mar. 12, 2012) (finding that, in order for internal report to be protected, it must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct."). To be actionable under the FCA, however, the internal report must actually be a report, and it must concern fraud on the government.

Relator may be saying that the protected FCA activity consisted of his statements that commercial and Part D contracting responsibilities should be separated. Such a notification, if it occurred, would not be a notification of an FCA violation, *i.e.,* fraud on the government; at most, it is a notification of non-compliance with industry guidelines. *Cf. Hutchins*, 253 F.3d at 187-88. (noting that "employer's non-compliance with federal or state regulations" is insufficient). To the extent Relator argues that this request put his employer on "notice," it is insufficient.[4]

---

4    I add that Relator's employer surely already knew whether negotiating functions were merged or separate; Relator alleged that he was required by his employer to take on that dual function. And the employer likewise was surely

8

> In short, the complaint does not make clear what Relator said, whether it was said to anyone at Novartis and if so to whom, and whether the conversation notified the employer of any actual fraud under the FCA. *Cf. United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439 (6th Cir. 2008) (reversing district court dismissal of § 3130(h) retaliation claim where plaintiff alleged that she "observed purportedly fraudulent activity and confronted her employer about it," she told employer that employer "was receiving illegal large incentive payments under its contract with DOE because [employer] was 'underreporting [its employees'] work-related injuries and illnesses. . . .She therefore connected her complaint of [employer's] actions, under-reporting, to a concern about fraud on the federal government.").
>
> I conclude that the allegations fail to allege that Relator notified his employer of conduct that was fraudulent under the FCA. The only conversation concretely described is one with an ESI representative, which Relator vaguely alleges must have gotten back to his supervisors. But even directly advising a supervisor of a difference in discounts or the failure to separate negotiating responsibilities, without more, is not a protected report of fraud on the government. Relator's failure to plead sufficient facts to establish these required elements warrants dismissal of this count.
>
> Accordingly, Novartis's motion to dismiss Count IV is granted. This dismissal, too, is without prejudice.

(Op. at 35–38)

### C. Discussion of Supplemental Allegations in the 1AC

Relator Perri believes that the supplemental allegations of the 1AC have remedied the deficiencies of the retaliation claim in the original complaint. As he notes, the anti-retaliation provision defines as protected conduct (a) acts "in furtherance of" an FCA action, and (b) "other efforts to stop" an FCA violation. *See* 31 U.S.C. § 3730(h).

Section 3730(h), in its pre-2010 form, contained only theory (a), and even that appeared in a form arguably narrower form than the one contained in the current version. The prior version of the statute listed examples, nonexclusive

---

already aware of the terms of the Part D and commercial contracts. [fn. in original]

to be sure, of acts in furtherance of an FCA action: "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section . . . ."[5] The implication seemed to be that the protected act needed to be fairly closely tied to the pursuit of a potential FCA claim. *See Hutchins*, 253 F.3d at 187 (A protected internal complaint must at least place the employer "on notice of the 'distinct possibility' of False Claims Act litigation.").[6]

---

[5]  Section 3730(h), as enacted in the False Claims Act of 1986, read as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

[6]  This standard does (or did) not require an announcement that a *qui tam* is imminent or underway, but it does require more than general grumbling about allegedly unethical practices:

> Determining what activities constitute "protected conduct" is a fact specific inquiry. But the case law indicates that "the protected conduct element ... does not require the plaintiff to have developed a winning qui tam action.... It only requires that the plaintiff engage[ ] in 'acts ... in furtherance of an action under[the False Claims Act].' " *Yesudian*, 153 F.3d at 739 (quoting 31 U.S.C. § 3730(h)). Under the appropriate set of facts, these activities can include internal reporting and investigation of an employer's false or fraudulent claims. *Id.* at 742 ("[It] would [not] ... be in the interest of law-abiding employers for the [False Claims Act] to force employees to report their concerns outside the corporation in order to gain whistleblower protection. Such a requirement would bypass internal controls and hotlines, damage corporate efforts at self-policing, and make it difficult for corporations and boards of directors to discover and correct on their own false claims made by rogue employees or managers."); *see also Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996), *cert. denied*, 519 U.S. 1148, 117 S. Ct. 1080, 137 L.Ed.2d 216 (1997); *Hopper*, 91 F.3d at 1269 ("[P]laintiff must be investigating matters which are calculated, or reasonably could lead to a viable [False Claims Act] action."); *Neal*, 33 F.3d at 864. "Mere dissatisfaction with one's treatment on the job is not, of course, enough. Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Yesudian*, 153 F.3d at 740 (citing *Hopper*, 91 F.3d at 1269); *see also Zahodnick*, 135 F.3d at 914 ("Simply reporting his concern of a

The current version of the anti-retaliation provision, however, is broader. Current Section 3730(h) defines protected conduct as including "lawful acts done by the employee . . . in furtherance of an action under this section." [7] It deletes the examples (investigation, initiation, testimony, etc.) that tended to tie such conduct to an identifiable FCA case. And the current version adds new language, explicitly expanding the definition of protected conduct to include "other efforts to stop 1 or more violations of this subchapter." "The apparent purpose of the amendment is to untether these newly protected efforts from the need to show that an FCA action is in the offing. Indeed, we and other circuits

---

> mischarging to the government to his supervisor does not suffice to establish that Zahodnick was acting 'in furtherance of' a qui tam action."); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir.1996).
>
> As noted, employees need not actually file a False Claims Act suit to assert a cause of action under § 3730. Requiring an employee to actually file a qui tam suit would blunt the incentive to investigate and report activity that may lead to viable False Claims Act suits. The False Claims Act was enacted to encourage parties to report fraudulent activity and was intended to "protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Yesudian*, 153 F.3d at 740 (citing Neal, 33 F.3d at 864).

*Hutchins*, 253 F.3d at 187–88. The abbreviated citations in the quotation are to *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C. Cir. 1998); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996); *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), *abrogated by Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 125 S. Ct. 2444 (2005); *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).

[7]   The current version of Section 3730(h) reads as follows:

> (h) Relief from retaliatory actions.--
>
> (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

11

have recognized that the amended language broadens the scope of protected activity." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200–01 (4th Cir. 2018) (citing cases).

In the 1AC, Perri now alleges more clearly that he made a direct "internal complaint to his supervisor" that implicated not just the rebate disparity but its illegality. (DE 51, Opp. Brf. at 6) The 1AC describes that internal complaint as follows:

> 70. Perri requested an in-person meeting with Birch[8] to express his concerns. The meeting occurred near the end of the first, and beginning of the second, fiscal quarter of 2014, and was uncharacteristically formal. Usually the two met over meals or sat at the conference table in Birch's office. This time, however, Birch remained behind his desk. Perri conveyed his concerns to Birch, and explained how increasing the disparity between the commercial and Part D rebate rates would expose the swap, subjecting Perri and Novartis to government prosecution. Perri went as far as to say that he "did not want to go to jail." Birch's response was, "f**k the government."

(1AC ¶ 70) Earlier in the 1AC, Perri defines the "swap" as the purposeful use of the commercial rebate to bring about what amounted to a disguised kickback at the expense of the Medicare and Medicaid side of the business. (*E.g.*, 1AC §§ 27–30, 42, 64–65).

In addition, Perri invokes the second prong of the current version of section 3730(h). His theory is no longer that his statements to Jeffery at ESI somehow got back to Novartis and therefore constituted an internal complaint. Now he says that his statements to Jeffery were "efforts to stop 1 or more violations" of the FCA:

> 72. Perri eventually decided to relay his concerns to his counterpart at ESI, Todd Jeffrey, in hopes that ESI would demand parity. Perri thought Jeffrey would be sympathetic to his concerns

---

8   The reference is to Greg Birch, Novartis's Vice President of Managed Care, to whom Perri reported. (1AC § 51)

12

> since each were being used by their respective companies to carry out this scheme.
>
> 73. After Perri's conversation with Jeffrey, ESI did demand an equal Part D rebate rate.

(1AC ¶¶ 72, 73)

These allegations, I find, are sufficient to set forth a claim of FCA retaliation. Employing a heightened Rule 9(b) standard of review, I ruled that the original complaint failed to set forth an FCA claim as such, but that is not a prerequisite to a retaliation claim. Section 3730(h) is broader than that. It never required a successful or even viable FCA claim, because it was aimed at encouraging whistleblowing. *See* p.5 n.2, *supra*. And now, in its current version, the statute encompasses "other efforts" to head off a potential FCA violation. These allegations will bear the interpretation that Perri intended his statements to be understood by his audience — sophisticated players in the pharmaceutical industry — as a warning against violation of the FCA.

The 1AC also contains allegations from which retaliation could be inferred. It alleges that Perri had received outstanding performance reviews in the days preceding his dismissal on June 17, 2018. His dismissal occurred within a reasonably short time (how short is not quite clear) after the alleged protected activity. Perri alleges on information and belief that word of his conversation with Jeffery got back to Novartis in June 2018, although his basis for that belief is unstated. He alleges that his sudden firing took place the day before a scheduled meeting with ESI on the subject of the Gilenya discount. That his severance package was accompanied by a demand that he waive any whistleblower claim is hardly conclusive, but is suggestive, of a retaliatory mindset. (1AC ¶¶ 75–78)

Perri's, of course, is not the only possible interpretation. It may be an issue of fact whether the dismissal was in retaliation for the whistleblowing, or the other way around. But such comparisons are not within the scope of a motion to dismiss governed by Rule 8 (as opposed to Rule 9(b)).  I am constrained to credit the allegations of the complaint as true.

## ORDER

IT IS THEREFORE, this 16th day of April, 2020

ORDERED that the motion (DE 48) of defendant Novartis to dismiss the First Amended Complaint is DENIED.

/s/ Kevin McNulty

———————————————

**Kevin McNulty**
**United States District Judge**